MARK J. CONNOT (10010)
KEVIN M. SUTEHALL (9437)
LUCY C. CROW (15203)
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, #700
Las Vegas, Nevada 89135
(702) 262-6899 tel
(702) 597-5503 fax
mconnot@foxrothschild.com
ksutehall@foxrothschild.com
lcrow@foxrothschild.com
*Attorneys for Plaintiff Ahern Rentals, Inc.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| AHERN RENTALS, INC., a Nevada corporation | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| EQUIPMENTSHARE.COM, Inc., a Delaware corporation; DOES I through X, inclusive; and ROE BUSINESS ENTITIES I through X, inclusive, | **JURY DEMAND** |
| Defendants. | |

Plaintiff Ahern Rentals, Inc. ("Plaintiff" or "Ahern"), by and through its undersigned attorneys, complains against Defendant Equipmentshare.com, Inc. ("Defendant") and states as follows:

### INTRODUCTION

1.    This action concerns Defendant Equipmentshare.com's systematic and illegal attempt to eliminate a competitor, Ahern Rentals and to achieve local or national monopolization of an industry, through a concerted nationwide raiding operation to hire Ahern's employees and customers based on lies and innuendo combined with the theft of proprietary trade secrets and other confidential information.

2.    Unlike Ahern, which has a 60 plus-year history of operating in the equipment rental space, Defendant is a newcomer to the industry. Lacking both the institutional knowledge and leadership that Ahern built over decades of hard work and expenditure of significant

resources, Defendant has sought to become the dominant force in the industry in a matter of years by exploiting Ahern's hard work, expertise, and experience by engaging in a highly organized conspiracy to steal these assets.

3.      Specifically, Defendant targeted, and continues to target, both management and non-management level employees of Ahern across the United States.  Engaging in lies and distortions about Ahern, its officers, and its principal shareholder, as well as leveraging stolen information about salaries that Ahern paid to its employees and then offering to pay individuals far in excess of market rates, Defendant recruited Ahern employees from across the country to join Defendant.  Defendant then called upon such employees to solicit additional Ahern employees.

4.      Defendant's solicitation of Ahern employees was merely the start of its illicit scheme.  Employees that Defendant hired from Ahern stole Ahern's valuable secrets, including, but not limited to, actual and prospective customer lists, vendor lists, pricing and sales data, employee information (including salary information), and business plans and strategies, among other things. The theft of this information, which occurred immediately before the employees left Ahern to take positions at Defendant, violated agreements between Ahern and the various employees.  In numerous cases, Defendant successfully caused employees that it poached from Ahern to email such confidential and proprietary information from Ahern email accounts to personal accounts in the days leading up to their departure from Ahern to Defendant.

5.      Defendant further sought to capitalize on the knowledge, training, and expertise that the poached employees brought with them, whether documented or not.  Defendant intentionally targeted and hired management-level employees from Ahern, who then used their knowledge of Ahern to assist Defendant in targeting other Ahern employees, including high grossing salespeople.

6.      Employees that Defendant hired from Plaintiff took the same or similar roles at Defendant's nascent operations, sometimes in the same cities where they previously worked for Ahern.   Ahern's former employees then began servicing Ahern customers by using and

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

exploiting the confidential and proprietary information that had been stolen from Ahern at Defendant's insistence or encouragement.  In other instances, employees sabotaged Ahern's business and relationships with its customers in the days before they left Ahern for Defendant.

7.     To date, Defendant hired more then 100, and perhaps more than 250, former Ahern employees, including branch managers, sales managers, service managers, sales representatives, mechanics, and other specialized employees from Ahern locations across the country.  Sometimes using little more than these individuals' knowledge and expertise as well as stolen proprietary information, Defendant established brick-and-mortar locations that compete directly with Ahern's existing locations.

8.     Defendant's goal is nothing less than the annihilation of Ahern, the attendant capture and consolidation of Ahern's market share, and eventual monopolization of the equipment rental industry, all through anticompetitive and illegal means.  Defendant's pattern of racketeering, fraud, defamation, and deception, has now gone on both surreptitiously and overtly for at least two years and is ongoing, has caused and continues to cause Ahern both monetary damages as well as irreparable harm that monetary damages are inadequate to redress.  This complaint is brought to seek and end to, and redress for, the harm that Defendant has intentionally caused to Ahern.

## PARTIES/ JURISDICTION/ VENUE

9.     Plaintiff is a Nevada corporation with headquarters in Las Vegas, Nevada.

10.     Upon information and belief, Defendant is Delaware corporation with its primary place of business in Missouri.

11.     The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants Does I through X and Roe Business Entities I through X, inclusive, are unknown to Plaintiff, who therefore sues these defendants by such fictitious names.  Plaintiff is informed and believes and thereon alleges that each of the defendants designated herein as Does and Roe Corporations are responsible in some manner for the events and happenings herein referred to and caused injury and damages proximately thereby to Plaintiff as herein alleged,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

including, but not limited to, participating in the misconduct described herein.  Plaintiff will ask leave of this Court to amend this complaint to insert the true names and capacities of defendants Does and Roe Corporations, including, when the same have been ascertained by Plaintiff, together with appropriate charging allegations, and adjoin such defendants in this action.

12.    The causes of action in this Complaint arise under racketeering and trade secret laws of the United States, the United States Computer and Fraud Abuse Act, and the United States Sherman Antitrust Act as well as the misappropriation, unfair trade practice, trade secret, computer trade practice, and racketeering laws of the State of Nevada and the tort common law of the State of Nevada.

13.    This Court has federal question jurisdiction over the causes of action arising under the laws of the United States pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over the remaining causes of action pursuant to 28 U.S.C. § 1367.

14.    This Court further has diversity jurisdiction over all causes of action pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

15.    Defendant is subject to nationwide personal jurisdiction in this Court pursuant to 15 U.S.C. § 22, which is applicable to the present case under 15 U.S.C. § 2 and 15 U.S.C. § 12. This Court maintains pendant personal jurisdiction over Defendant in relation to the remaining claims because Defendant targeted Plaintiff's computer servers and principal employees located in Nevada, Defendant directed its intentional and wrongful acts at Nevada, Defendant's wrongful acts and omissions caused economic harm in Nevada, Defendant knew Plaintiff maintains its headquarters in Nevada, this action requires application of Nevada law, and all causes of action arise under a common nucleus of operative facts.

16.    Defendant is further subject to specific personal jurisdiction in this Court because Defendant purposefully reached into Nevada by targeting Plaintiff, Plaintiff's servers, which are located in Nevada, and Plaintiff's principal employees. Defendant's intentional acts caused economic harm to Plaintiff in Nevada in the form of lost profits and lost business. This Court

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

maintains pendent personal jurisdiction over all claims for the reasons stated in the foregoing paragraph.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Defendant or its agents are targeting Plaintiff's servers and employees in Nevada, Defendant caused and continues to cause harm to Plaintiff in Nevada, and Defendant transacts in Nevada.

## FACTUAL ALLEGATIONS

### History of Ahern

18.     The origin of Ahern was in 1953 in Las Vegas, Nevada, when John P. Ahern and Martha Ahern purchased a Signal Oil & Gas station at the site that is now the Stratosphere Casino, Hotel, and Tower near the Las Vegas Strip.  From that gas station, Ahern started selling gas and diesel and renting equipment to its customers. It first started renting window-mounted automobile swamp coolers to tourists traveling to California.  Later, Ahern's rental inventory expended to include trailers, hand tools, trucks, and then construction equipment and homeowners' items.

19.     In 1958, through hard work and dedication John Ahern and Martha Ahern's rental operation outgrew the Signal Oil & Gas station, at which time they moved the rental business to its own location.  Ahern's Trailer and Equipment Rental was opened in 1958, and its focus was solely on renting tools and equipment to residents of the Las Vegas area.

20.     John Ahern launched Ahern's Renter's Center in 1970.  The center offered a wide range of equipment for homeowners and local businesses.

21.     In the 1970s, John and Martha Ahern's son, Don Ahern, joined the family business.

22.     Don Ahern saw the potential rental market for high reach equipment and he set up his own small rental store in 1978, starting with a fleet of eight scissor lifts. As demand increased, Don Ahern relocated and renamed the company Los Arcos Equipment, expanding across Southern Nevada and Southern California by 1983.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

23.     Don Ahern bought Ahern Renter's Center from his father in 1990. The two companies were combined into one business and became Plaintiff Ahern Rentals, Inc., in 1997.

24.     Over its more than 60 year history, Ahern became the largest independently owned rental company in the United States.   Ahern organically expanded across the country, opening one location after another by utilizing its decades of institutional knowledge and experience to serve its expanding clientele.

25.     Ahern remains family owned to this day.  Ahern currently operates more than 90 locations across more than 30 states.  Ahern has over 59,000 rental items including over 35,000 high reach units, and serves customers in many sectors, including construction, industrial, residential, utilities, municipalities, conventions, and entertainment and events. Ahern specializes in high reach equipment, permitting the safe lifting of people or materials to work at significant heights, and offers one of the largest selections in the industry. Ahern's extensive rental fleet includes general rental units, such as backhoes, skid steers, skip loaders, trenchers, compressors, generators, light towers, welders, lawn and garden equipment, hand tools and much more.

26.     In addition to renting such equipment, Ahern sells parts and new and used equipment, both itself and through related manufacturing entities.

27.     Don Ahern has been the Chief Executive Officer and a member of the board of directors of Ahern since 1994.  He possesses more than 40 years of experience in the equipment rental industry.

28.     Each of Ahern's more than 90 locations has a similar management structure.  A branch manager manages each location.  Under each branch manager is a sales manager and a service manager.  Each sales manager is responsible for sales at each location, including managing a teams of salespersons.  Under each service manager are teams of specialized workers who maintain the equipment leased from their respective locations, using a team of skilled mechanics, drivers, and technicians, among other things.  The branch managers, sales managers, service managers, and in some locations parts managers, combined with salespeople, mechanics and other employees, are the lifeblood of Ahern's nationwide operation.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

29.     Ahern invests substantial money and time into training employees.   Ahern implements an extensive training program for its employees, including an academy where Ahern trains its employees annually.   Ahern sales representatives, for example, attend a four day training program with seven hours of training each day.   For these training programs, which occur almost every week at the Ahern Academy in Las Vegas, Ahern brings employees to Las Vegas at considerable expense.   During the training, Ahern imparts on its employees its trade secrets, including its proprietary and confidential business and sales strategies, safety and equipment training, information about national accounts, and various other subjects. The employees also see Ahern's headquarters and affiliated manufacturing operations, which are unique to Ahern in the industry.   During the training, Don Ahern himself talks to the employees as a group and imparts his wisdom both in business and life.

30.     Ahern is private and family owned and is still run like a family business.   Don Ahern makes it a point to meet with, and care for, his employees.   When Don Ahern visits a branch, he walks and talks with the employees. Don Ahern's cell number is available in the employee phone directory so any employee can call and talk to him at any time if they have any issues, work or personal.

31.     Ahern invests in and values and cares about its employees, many of whom has long tenures with the company.   Defendant is now attempting to interfere with and exploit this very workforce.

**Construction Equipment Rental Industry**

32.     The equipment rental field that Ahern operates in is a highly competitive, multi-billion dollar industry.   United Rentals, Inc. ("United") is the nation's largest equipment rental company with a market share in excess of 10% of the overall market.   Over the past several years, United acquired numerous competing equipment rental companies and related businesses.

33.     Within the construction equipment rental industry, competition for employees is fierce.   Upon information and belief, most of the largest companies in the industry, including

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

United and Sunbelt Rentals, require employees to sign non-competition/non-solicitation agreements as a condition of employment.

34.    Until recently, and during the period relevant to the allegations in this complaint, Ahern did not require employees to execute non-competition agreements.  However, Ahern required employees to sign various agreements related to their employment as detailed below.

**Equipmentshare.com**

35.    Upon information and belief, Defendant was formed in November 2014 by brothers Willy and Jabbok Schlacks.  Upon information and belief, the Schlacks brothers had no experience in the rental equipment industry when they formed Defendant.

36.    Upon information and belief, Defendant's business model, initially, concerned the use of the so-called ES Track telematics system to track construction fleets and to gather information about the location and status of equipment in real time.  Further, upon information and belief, Defendant would use the telematics system to track and share equipment and become (as reported by certain media outlets) the "Airbnb of construction."

37.    Upon information and belief, despite an influx of capital from various sources as reported in the media, Defendant's initial business model was unsuccessful.  Accordingly, Defendant apparently decided to become (or to focus on) regional brick-and-mortar equipment rental operations sometime in 2016 or 2017.

38.    Upon information and belief, Defendant lacked the institutional knowledge or expertise to successfully open and operate brick-and-mortar equipment rental operations.

39.    Additionally, upon information and belief, Defendant was and remains under pressure from its investors and/or lenders to rapidly grow and generate revenues and profits and become economically sustainable before Defendant's seed money is depleted.

40.    As described fully below, rather than build its operations organically, Defendant engaged in a concerted plan to build brick-and-mortar locations through tortious actions targeting Ahern and its employees, who possess combined decades of experience in the marketplace. Defendant has gone from zero physical locations to 35 or more physical locations in under five

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

years and now claims to have 1,300-plus employees.  Defendant apparently intends to open 100 physical locations per year in the future in an attempt to dominate the equipment rental market within a matter of five or fewer years.

### Defendant's Racketeering Conspiracy to Destroy Ahern

41.     While Ahern was unaware of it at the time, sometime in or around early- to mid-2017, Defendant began a concerted enterprise designed to destroy Ahern and to capture market share by systematically looting Ahern's employees, trade secrets, and proprietary and confidential information.

42.     Upon information and belief, Defendant targeted Ahern and Ahern's employees as part of its illicit scheme specifically because Defendant knew or believed that Ahern did not require employees to execute non-competition agreements.  Based on Defendant's apparent knowledge about Ahern employees not executing non-competition agreements, Defendant knew or should have known that those same Ahern employees were subject to various employment-related agreements and provisions as described below.

43.     Defendant's plan to poach key employees from Ahern included using misinformation.  Defendant reached out to Ahern employees to gauge the employees' willingness or eagerness to leave Ahern, via telephonic means and possibly otherwise.

44.     During these initial contacts and communications, Defendant and/or its authorized agents misrepresented facts about, and defamed, Ahern.  These misrepresentations and defamatory statements included, but are not limited to, claiming that United would soon buy out Ahern (and implying that such a buyout or merger would result in layoffs), claiming that Don Ahern was of ill-health and without a succession plan (and therefore implying that the company's future was in jeopardy and/or that a sale was forthcoming), and claiming that a corporate officer of Ahern had been caught in a compromising sexual position, among other false and defamatory statements as discussed herein.

45.     Defendant's false representation that Ahern intended to sell out to United was particularly intended to cause fear and anxiety about the company's future while simultaneously

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

enticing employees to leave for Defendant, which portrayed itself as an ascending giant in the industry.

46.     Defendant's statements to Ahern employees about Ahern were either false or misleading, but they served Defendant's purpose by causing Ahern's employees to feel uncertain about the company's future and to question the company's long-term viability.

47.      Defendant combined its false-flag campaign with offers to pay Ahern employees more in salary than they earned with Ahern, in some instances, dramatically more than market/industry standards, which artificially inflates expenses in the industry.

48.     Defendant did not merely lure Ahern's employees away using the foregoing tactics.  Upon information and belief, and as described in examples below, Defendant directed outgoing Ahern employees to steal Ahern's proprietary, confidential, and trade secret information immediately before they left Ahern to begin working for Defendant. Ahern subsequently learned, that in numerous instances, immediately before leaving Ahern and joining Defendant, employees secretly and improperly emailed to themselves copies of customer lists, equipment rental rates, master key account information, account information, customer price sheets and other pricing information, customer credit applications, national account information, and central regional account information, among other things, which were all confidential.

49.     In at least one instance described below, an Ahern employee, immediately before leaving Ahern and joining Defendant, took steps to actively sabotage Ahern's business with its customers through lies and deception.

50.     Defendant targeted a large number of Ahern sales representatives as part of its conspiracy, and did so at least in part because, unlike common industry practice, Ahern's sales representatives are account based, meaning they are tied to clients.  Sales representatives are not tied to geographic regions or territories.  As a result, Defendant's poaching of Ahern's sales representatives has effectively caused large numbers of Ahern clients to immediately follow their sales representative contacts to Defendant.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

51.     Ahern employees who left for Defendant caused Ahern customers to leave Ahern for Defendant.  Ahern's loss of customers and customer relationships built over decades has cost Ahern tens of millions of dollars in lost revenues.

52.     Because Ahern is private and family owned, Defendant's noncompetitive behavior is particularly damaging.  Unlike other competitors in the industry, Ahern cannot raise capital through public markets.  Accordingly, Defendant's noncompetitive behavior as described herein, which is intended to reduce Ahern's revenues while increasing its expenses, reflects a plan to destroy Ahern.

53.     As described below, Ahern instituted civil actions against six of its former employees as well as Defendant in various jurisdictions relating expressly to the former employees' violations of the terms of their employment with Ahern and Defendant's complicity therewith.  However, Ahern believes that, to date, in excess of 100 (and perhaps more than 250 or 300) of Ahern's roughly 3,000 employees left to become employees of Defendant as a result of Defendant's racketeering conspiracy and scheme.  Accordingly, approaching ten percent of Ahern's employees left Ahern for Defendant in very short order.

**Ahern's Protection of Confidential/Proprietary Information**

54.     When employees begin with Ahern, they are required to execute various new hire forms.  Those forms include a number of employment-related agreements.

55.     One of the new hire forms employees are required to sign is a document entitled "Receipt of Employee Handbook and Acknowledgement of At-Will Employment."

56.     The Employee Handbook requires employees to safeguard confidential information and refrain from using confidential information outside the scope of their employment (the "Confidentiality Provision"). The Confidentiality Provision provides, "[e]ach employee is responsible for safeguarding and avoiding the use of confidential information obtained during employment with the Company [Ahern] and thereafter in perpetuity. All employees, including past, present, and future, have the responsibility to prevent revealing,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

divulging and/or using any such information unless it is necessary to perform expressed job duties."

57.     The Confidentiality Provision defines "confidential information" as "confidential techniques, business strategies and plans, methods, processes, formulae, compositions, systems, inventions, machines, computer programs, research projects, actual and prospective customer lists, addresses and personal information, vendor lists, pricing data including rate structures, sales information, sources of supply, financial data and marketing, production or merchandising systems or plans, training materials and information, and Company procedures and policies."

58.     Pursuant to the Confidentiality Provision, an Ahern employee's "duty to safeguard the confidential information shall exceed [the employee's] period of employment in perpetuity."

59.     The Confidentiality Provision restricts access to confidential information. The Confidentiality Provision provides, "[c]onfidential information is maintained on a need-to-know basis and must be authorized by your manager before you are permitted access."

60.     Apparently, unlike Defendant, Ahern required incoming employees to sign a "Disclosure and Indemnification Agreement" that, among other things, precluded those employees from disclosing to Ahern trade secrets, confidential information, or proprietary information of the employee's prior employer.

61.     Ahern employees are required to execute a "Confidentiality and Invention Assignment Agreement" (the "Confidentiality Agreement").  The Confidentiality Agreement broadly defines "Confidential Information" to include Ahern's "trade secrets, customer lists, customer purchasing histories and plans, costs, budgets, policies, procedures, processes, methods of operations, pricing, marketing plans, financial information, personnel information, compensation programs, vendor sources, vendor identities and capabilities, research, machine and component histories, engineering data, designs and drawings, design standards, formulas, computer software and programs, Inventions . . ., and other data as well as information which Company receives from a third party and holds in confidence."  By executing the Confidentiality

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

Agreement, Ahern employees agree that "I shall not at any time during my employment with Company or at any time thereafter, directly or indirectly disclose to any person or entity or use any Confidential Information except in the normal course of my duties as an employee of Company," among other terms.

62.     The Confidentiality Agreement also contains a remedies provision which states in relevant part that "Irreparable damage shall result to Company in the event of the breach by me of this Agreement. In the event of a breach or threatened breach by me, Company shall be entitled to all remedies, including money damages, as well as injunctive relief and such other equitable relief to prevent or restrain any breach or threatened breach of this Agreement. Each remedy of Company shall be cumulative and not in limitation of any injunctive relief or other rights or remedies which Company is or may be entitled at law or in equity. Company shall be entitled to its reasonable attorney's fees, expert witness fees, and other expenses and costs it incurs in enforcing this Agreement or pursuing damages for my breach of this agreement."

63.     Ahern uses additional documents to further protect confidential information. Ahern utilizes a "Blogging and Social Network Policy" which concerns communications about Ahern's business outside of Ahern's internal network.  It prohibits the dissemination of certain information outside of the company.   Among other things, the Blogging and Social Network Policy provides that employees "must not breach the law, violate individual rights, or disclose or otherwise publish trade secrets, proprietary information, or confidential material. Nor shall they breach or infringe upon Ahern's trademarks, copyrights, or other intellectual property, defame or in any way harm or negatively affect Ahern, its affiliates, related entities, their respective employees (current or former), suppliers, vendors, advisors, customers and/or anyone associated with and/or otherwise doing business with Ahern,"

64.     All Ahern employees are required to acknowledge and agree to a Security Access User Responsibility Acknowledgement and Agreement (the "Security Access Agreement").  The Security Access Agreement provides that employees who are entrusted with certain passwords and security access codes used to access, view, and/or transfer confidential information "may

not, and will not, use such Security Access or Information for any purpose outside of performing your bona fide job duties," among other prohibitions.

65. Ahern employees are required to acknowledge and agree to the terms of an E-Mail/Systems Misuse" agreement (the "Email Misuse Agreement"). The Email Misuse Agreement allows Ahern to protect its confidential information by limiting use of Ahern's email systems to Ahern business only, among other things. By executing the Email Misuse Agreement, Ahern employees agree to the following, among other things: "You may be given internet and e-mail access to assist you in the completion of your job duties. Keep in mind that these systems are business tools and you are expected to use them for legitimate business purposes for the benefit of the Company. . . . Company equipment (including computers equipped for internet access), e-mail and voicemail systems are to be used for Company business only."

66. Ahern employees execute a "Code of Conduct." Among many other things, the Code of Conduct states that "theft, destruction, damage, or unauthorized removal or use of Company property or materials, including documents, records, data, computer programs, training materials and other proprietary information and materials" is prohibited and is grounds for discipline including immediate termination.

67. The Code of Conduct also prohibits (and subjects employees to discipline for) the "failure or refusal to follow general policies, rules and regulations of the Company" and "disclosing or discussing company or customer confidential matters to outsiders."

68. Depending on their start date with the company, not necessarily every Ahern employee signed each of the foregoing documents (the Receipt of Employee Handbook and Acknowledgement of At-Will Employment, the Confidentiality Agreement, the Blogging and Social Network Policy, the Security Access Agreement, the Email Misuse Agreement, and the Code of Conduct). Most employees, however, signed nearly all or all of the foregoing agreements.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

69.     Ahern employees have varying levels of access to a computerized system referred to as "AS400", also known as "RentalMan". The AS400 system, which is housed on servers in Nevada, includes a system where certain employees clock in and out, and holds customer lists and related rental/purchase data, employee data (including salary information), and pricing information, among other things.

70.     While it is unknown exactly when Defendant became knowledgeable of the foregoing agreements executed between Ahern and its employees, it is clear that Defendant did indeed know about the agreements, but continued its conspiracy against Ahern despite that knowledge. On January 17, 2019, counsel for Ahern sent letters to Jabbok Schlacks, Defendant's Chief Executive Officer, as well as numerous former Ahern employees. In the letter to Schlacks, counsel for Ahern described Defendant's unfair competition, the en masse departures from Ahern to Defendant, and the resulting breaches of the employees' respective employment agreements with Ahern. Ahern demanded that Defendant take immediate measures to prevent former employees or those at their direction from continuing these unlawful activities.

71.     Defendant, nonetheless, continued to encourage, demand, or require former Ahern employees to violate their agreements with Ahern through the pattern and practice of misconduct described herein.

**Defendant's Conspiratorial Misconduct in Texas**

72.      Defendant's initial attempts to lure Ahern's employees through the misconduct alleged herein and the seeds of its conspiracy to destroy Ahern through anti-competitive means appear to have been planted in Texas.

73.      Upon information and belief, Defendant took Ahern's confidential, proprietary, and trade secret information by coercing Ahern employees to secretly email Ahern's confidential information from their Ahern email addresses to their personal email addresses.

74.     After he previously worked for Ahern for six month stint between 2011 and 2012, in June 2013, Ahern re-hired Keith Menges. Menges was initially in a "counter" role but was moved to a sales representative position in 2014. Ahern employed Menges in San Antonio,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

Texas for four years until he suddenly resigned from Ahern on December 28, 2017. Defendant then began employing Menges.

75. At various points during his employment at Ahern, Menges executed the Receipt of Employee Handbook and Acknowledgement of At-Will Employment, the Email Misuse Agreement, the Code of Conduct, the Blogging and Social Network Policy, and the Security Access Agreement. Under these agreements, Menges agreed to protect Ahern's confidential information from disclosure as described above.

76. Before Menges began working for Defendant, Menges emailed Ahern's confidential master key account information from his Ahern email address to his personal email address on at least three occasions. On December 20, 2017, one week before Menges resigned, he sent the master key account information to his personal email address a final time.

77. The master key account information contains confidential and proprietary information about Ahern's customers that gives Ahern a competitive advantage, including who are the key decision-makers working for customers, what customers may be interested in buying, customers' future plans, and personal information about the decision-makers at or owners of customers such as the names of their children, wives, or right hand men. The master key account information also reveals how much revenue is generated from each customer over intervals of 90, 180, and 270 days as well as the revenue generated from the customer the prior year.

78. Upon information and belief, Defendant and Menges used and continue to use Ahern's confidential master key account information.

79. Despite Ahern's demand that Defendant and Menges cease and desist use of Ahern's confidential and trade secret information, Defendant and Menges, upon information and belief, continue to use Ahern's confidential and trade secret information.

80. In February 2017, Ahern hired Chad Haag as a sales representative at its McKinney, Texas branch. Upon starting employment at Ahern, Haag executed the Receipt of Employee Handbook and Acknowledgement of At-Will Employment, the Security Access Agreement, the Email Misuse Agreement, the Code of Conduct, the Blogging and Social

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

Network Policy, and the Confidentiality Agreement, among other things. Under these agreements, Haag agreed to protect Ahern's confidential information from disclosure as described above.

81.     Ahern employed Haag until Haag resigned in late 2017 and went to work for Defendant. Defendant then began employing Haag.

82.     Before Haag resigned from Ahern and began working for Defendant, Haag emailed Ahern's confidential information from his Ahern email address to his personal email address.

83.     Haag emailed Ahern's confidential information to his personal email address on at least seven occasions. On August 23, 2017, Haag emailed the master national customer list and central regional account list to his personal email account. Ahern's account lists contain information on individual customers, their addresses, and the revenue generated by each customer over the past several years. On September 3, 2017, Haag emailed additional customer information, including contact information, to his personal email account.   While Ahern employed Haag, Haag also secretly sent Ahern's confidential price sheets for at least fifteen customers, customer credit applications, and internal forms to his personal account.

84.     Upon information and belief, Defendant and Haag used and continue to use Ahern's confidential and trade secret information.

85.     Despite Ahern's demand that Defendant and Haag cease and desist use of Ahern's confidential and trade secret information, Defendant and Haag, upon information and belief, continue to use Ahern's confidential and trade secret information.

86.     Ahern filed a complaint against Defendant, Menges, and Haag in the Collin County Court, Texas, on July 9, 2019 in relation to the foregoing allegations.  For purposes of this action, Defendant's actions with respect to Menges and Haag provide an example of Defendant's conspiracy against Ahern alleged herein.

87.     In addition to Menges, Defendant hired at least nine Ahern employees from its San Antonio, Texas location, including multiple branch managers, sales representatives, and

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

other employees.  A former Ahern branch manager that left for Defendant told Ahern employees that Ahern was selling to United, targeted Ahern customers, and badmouthed Ahern, among other misconduct.

88.    In addition to Haag, Defendant hired at least four additional Ahern employees from Ahern's McKinney, Texas location, including two additional sales representatives.

89.    Defendant's misconduct and conspiracy played out repeatedly in Texas.  For example, in Corpus Christi, Texas, Defendant hired from Ahern a branch manager, a sales/branch manager, multiple sales representatives, and multiple mechanics, among others.  Former branch manager, Dale Lawrence, stated that he was going to "crush" Ahern's local branch.  Defendant unsuccessfully targeted numerous other Ahern employees from the branch.

90.    In one instance, before an Ahern employee named Seth Taylor left the Corpus Christi branch of Ahern, Taylor's branch manager told him that Ahern would provide a certain customer with the use of a particular boom for free for one day.  Rather than tell the customer that Ahern would provide use of the book for free for a day, Taylor told the customer that Ahern's branch manager would not give the customer anything for free in an apparent attempt to damage the customer's relationship with Ahern.  Taylor left Ahern to work for Defendant shortly thereafter, and Ahern's business with the customer subsequently dropped off.

91.    In September 2018, Dale Lawrence, while he was still the branch manager for Ahern's Corpus Christi location, approached at least two Ahern employees, including a counter dispatcher, to inquire if they would leave Ahern to work for Defendant.  Lawrence asked the Ahern employees to stay with Ahern while he set up Defendant's new location and took all of Ahern's customers, after which Lawrence stated that he would hire them to work for Defendant.

92.    Later, after Lawrence left Ahern and while in a vehicle with the Ahern dispatcher, Lawrence had a phone conversation with another former Ahern employee that had left to work for Defendant.  During the call, Lawrence apparently asked about the dispatcher's pay at Ahern.  During the same drive, Lawrence offered the dispatcher a $7 per hour raise over what Ahern was paying him.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

93.     On another occasion, Taylor texted the Ahern dispatcher asking for the phone number of an Ahern customer that he had not serviced while at Ahern.  Ahern also learned that Taylor had linked his cell phone to his personal iPad so that he could access the Ahern AS400 system after he left Ahern.

94.     In yet another instance,. Taylor attempted to solicit another Ahern employee to leave Ahern and work for Defendant. Taylor stated that Ahern was going to be "shut down." When asked what he meant by "shut down", Taylor stated that he had used a chip to download all of the data from his Ahern work cell phone, including customer names, contact information, and pricing information, and that he was going to take all of the customers with him.

95.     In Houston, Texas, which may have been the location where Defendant's conspiracy first played out, Defendant hired at least 14 different Ahern employees, including sales managers, sales representatives, mechanics, and operations/service employees, among others.  Defendant's employees told Ahern employees that United was going to buy Defendant out and that Defendant knew Ahern's pay scales.  Customers reported to Ahern that Defendant's goal was to drive rates down and force Ahern out of the Houston market.

96.     In one instance, a Houston-based Ahern sales representative named Emilio Valdez left to work for Defendant sometime in or after September 2017.  Thereafter, a representative of a particular Ahern customer spoke with a different Ahern sales representative. That customer representative stated that Valdez had reached out to the customer to try to get the customer to move its business to Defendant.  The customer representative further stated that Valdez stated that Defendant would provide specific incentives that Ahern had provided to the customer, and also offered to beat Ahern's price by $100.00.

97.     In Austin, Texas, Defendant solicited at least 10 Ahern employees and hired at least nine former Ahern employees.  This includes multiple sales representatives and a branch manager, among others.

98.     In Irving, Texas, Defendant hired at least 11 Ahern employees, including multiple branch managers, mechanics, and at least one sales representative.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

99.     In or around January 2019, Aaron Moore, currently Ahern's branch manager in Irving, Texas, started receiving calls from Richard Redstone and Ben Skroh, former Ahern employees that had left for Defendant.  The calls continued for months.

100.     During one of those calls, Skroh stated that Defendant was offering five hundred dollars ($500.00) for every person they could bring to EquipmentShare, provided the new employee stayed for 90 days. On another occasion, Richard Redstone and Ben Skroh stated to Moore that Don Ahern was giving up and was going to sell Ahern.

101.     During a different telephone call, Richard Redstone stated to Moore that Defendant's Vice President, David Brown, was related to Ahern's Mark Brown and the two companies were going to merge together and form one company.

102.     On or about April 1, 2019, Moore received a telephone call from Tyler Covington, who identified himself as a manager for Defendant. Covington stated that Defendant was looking for experienced people and wanted to go to lunch with Moore.

103.     On or about April 5, 2019, Moore met Covington for lunch. Covington stated that Defendant needed "experienced" people to work for it. He stated that most of the people that worked at Defendant were "inexperienced" and had no rental industry experience or only had a couple of years work experience in the industry.  During that lunch meeting, Covington stated that Defendant loved to get Ahern employees because they were well trained, had a lot of experience, and they could use them with little or no training. Covington further stated that Defendant could also use experienced Ahern employees to train other Defendant employees that were inexperienced.  During the same meeting, Covington stated that Defendant had "endless deep pockets" and was intending to open an additional five or six locations in the Irving, Texas area.

104.     During the lunch meeting, Covington made an offer of employment to Moore. Covington offered Moore an approximately twenty-five cents an hour raise over what Moore was then making. Moore believes that Richard Redstone, who was Moore's previous boss and had

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

access to Moore's salary information, had told Covington what Moore was paid hourly at Ahern so that Defendant could offer Moore slightly above what he was earning.

105.    Moore accepted the offer of employment to work for Defendant, but not because of the pay raise.  Rather, Moore believed Covington's statement that Defendant had unlimited money and that Ahern was either going to be sold or would join with Defendant.  Moore started working with Defendant in May 2019, but immediately discovered that Defendant had no structure and that everyone was flying by the seat of their pants.  Moore ended up returning to Ahern about five weeks later.

106.    Defendant targeted and hired Ahern employees from multiple other Texas locations, including in El Paso, Lake Dallas, Lubbock, Odessa, and Waco.

107.    Upon information and belief, the same misconduct described above (in one form or another) accompanied the raiding of Ahern's employees, business, and confidential and proprietary information in Texas.

**Defendant's Conspiratorial Misconduct in California**

108.    Upon information and belief, in California, Defendant took Ahern's confidential, proprietary, and trade secret information by coercing Ahern employees to secretly email Ahern's confidential information from the their Ahern email addresses to their personal email addresses. Defendant's conspiracy against Ahern is believed to be accelerating in California.

109.    Ahern employed Matthew Allen as a sales representative in Sacramento, California beginning in or about June 2002.  Upon starting employment at Ahern or thereafter, Allen executed an early version of the Email Misuse Agreement, the Receipt of Employee Handbook and Acknowledgement of At-Will Employment, and the Blogging and Social Network Policy, among other things.

110.    Ahern employed Allen until he resigned and began working for Defendant.

111.    In June 2019, after Allen began working for Defendant, he contacted at least one other Ahern employee, an outside sales representative, and made scurrilous allegations about the Ahern employee's commissions, alleging that Ahern was "screwing" the employee out of

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

commissions with a specific customer. These allegations were made in an attempt to lure the employee to come work for Defendant. Thus, as an instrumentality of Defendant, Allen attempted to poison Ahern's relationship with its employee based on details about a customer and Ahern's payment of commissions, all of which Allen learned while he worked for Ahern.

112.     Even after the sales representative declined Allen's overtures toward hiring the representative to work for Defendant, Defendant emailed the sales representative an offer of employment to the representative's personal email address.

113.     Allen also referenced sensitive and proprietary internal practices of Ahern as he attempted to lure Ahern employees to Defendant. These practices included details of confidential compensation programs that Allen learned of during his time at Ahern.

114.     Allen also repeatedly contacted a credit manager for Ahern based in Las Vegas, Nevada, in July 2019 in an attempt to lure her to Defendant.

115.     Allen also contacted a Sacramento-based field service mechanic at Ahern after Allen left to work for Defendant. During the call, Allen told the Ahern mechanic that he knew how much money the mechanic was making and offered the mechanic more to come work for Allen and Defendant in Sacramento, California.

116.     Ahern employed Derrick Torres as a branch manager in Fremont, California. Upon starting employment at Ahern or thereafter, Torres executed the Receipt of Employee Handbook and Acknowledgement of At-Will Employment, the Blogging and Social Network Policy, the Code of Conduct, the Email Misuse Agreement, and the Security Access Agreement, among other things.

117.     Ahern employed Torres until he resigned on January 25, 2016, and began working for Defendant.

118.     Not even one hour before he resigned, Torres sent confidential Ahern information from his Ahern email account to his personal email account. This included a document detailing Ahern's branch manager functions and structure, duties and responsibilities, expectations, goals,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

organizational relationships, qualifications and demands, as well as compensation structure—essentially the roadmap of Ahern's branch operations.

119.    Torres also misappropriated Ahern assets and violated company policies in the timeframe before his departure from Ahern, including writing contracts to himself as the customer for free and heavily discounted use of Ahern equipment, apparently to curry favor with customers before his move to Defendant.

120.    As employees of Defendant, Torres and Allen targeted and continue to target Ahern employees by personally contacting Ahern employees and asking the employees to leave Ahern for Defendant.

121.    Upon information and belief, Defendant, Torres, and Allen used and continue to use Ahern's confidential personnel information, which Torres and Allen learned while Ahern employed them, to target Ahern employees.

122.    Despite Ahern's demand that Defendant, Torres, and Allen cease and desist use of Ahern's confidential and trade secret information, Defendant, Torres, and Allen, upon information and belief, continue to use Ahern's confidential and trade secret information.

123.    Ahern filed a complaint against Defendant, Torres, and Allen in the United States District Court for the Eastern District of California, on September 9, 2019. For purposes of this action, Defendant's actions with respect to Torres and Allen provide yet another example of Defendant's conspiracy against Ahern alleged herein.

124.    Defendant has, and continues to, solicit additional Ahern employees as Defendant seeks to establish bases of operations in California.  Defendant hired at least one sales representative from Ahern's Bakersfield, La Mirada, Sacramento, and Modesto branches, and solicited and hired other Ahern employees from its Bakersfield, Bloomington, Irwindale, Romoland, San Francisco, San Leandro, Santa Ana, and Ventura locations.

### Defendant's Conspiratorial Misconduct in Colorado

125.    Defendant, apparently knowledgeable about which of Ahern's sales representatives in Colorado controlled the biggest books of business, reached out to Ahern's two

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

highest grossing salesperson the state.  Defendant has in fact hired at least three former Ahern employees from Ahern's Denver, Colorado location, including a driver, a mechanic, and a sales representative.  The sales representative was Ahern's second highest grossing employee in the state.

126.    Defendant also solicited and attempted to recruit, M. Elliot Vigil, Ahern's top grossing sales representative in Colorado, beginning in or around March or April 2019.  Matthew Allen, the former Ahern employee discussed above, made first contact with Vigil.

127.    In June 2019, Vigil agreed to meet with Defendant, in part to gather information about Defendant.  Vigil and his wife met for dinner with Zach Sullivan, Defendant's Vice President of Sales for the mountain region, as well as Jabbok Schlacks, at Ted's Montana Grill in Denver, Colorado.

128.    During the dinner meeting, Defendant's representatives discussed their expansion plans with Vigil.  Defendant's representatives stated that they planned to open 20 new branches within the following six months, including multiple locations in Los Angeles and locations in San Diego and San Francisco, California; Charleston, South Carolina; Birmingham, Alabama; Atlanta and Savannah, Georgia.  Ahern operates locations in each of these cities.

129.    Defendant's representatives also stated that Defendant planned to open 100 new locations in 2020 and 300 locations over the following three years.  Defendant's representatives claimed Defendant would soon be the biggest buyer of certain equipment in the world, that it would have an unlimited fleet and would buy whatever was needed, and that its buying power would give it the best prices in the industry.

130.    When asked how Defendant was able to open so many locations across the country so fast, Jabbok Schlacks stated that Defendant had to have people and property.  He stated that having the right people was the most important, and that meant people across the board—"good manager, good sales, good team."  Schlacks stated that Defendant has a "process" for hiring the right people, falsely claiming that it was based on "integrity, drive, and intelligence."  Schlacks stated that "we [Defendant] are opening one store every three days."

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

Defendant's Vice President of Sales, Sullivan stated "when you get the right people in play, it speeds up the process."

131.    The process Jabbok Schlacks referred to appears to revolve around the rapid-fire hiring Ahern employees—apparently the "right people" for Defendant—and stealing Ahern's proprietary information and trade secrets.

132.    During the conversation, Jabbok Schlacks relayed his inside knowledge about Ahern. Specifically, Schlacks discussed how Ahern depreciates its equipment by part and how Ahern finances its machinery.

133.    On May 24, 2019, before the dinner meeting, as part of the scheme to encourage Vigil to leave Ahern, Defendant's representative Zach Sullivan stated in a text message to Vigil that "I heard United is buying you guys [Ahern] in the next 30-45 days."

**Defendant's Conspiratorial Misconduct in Utah**

134.    Defendant improperly acquired confidential, proprietary, and trade secret information from Ahern's former employee in Utah who secretly emailed Ahern's confidential information to her personal email address.

135.    On or about August 3, 2010, Ahern hired Michelle McCormac as a sales representative in Utah. As a sales representative, McCormac was the face of Ahern to current and prospective Ahern customers.

136.    Upon starting her employment at Ahern, McCormac acknowledged that she read, understood, and agreed to comply with the terms of the Employee Handbook, including the Confidentiality Provision.  In addition to agreeing to the Confidentiality Provision, at various dates McCormac agreed to the Email Misuse Agreement, the Code of Conduct, and the Blogging and Social Network Policy,

137.    Ahern employed McCormac for over nine years. Throughout those nine years, McCormac could access sensitive, confidential, and trade secret information about Ahern's business, customers, employees, business plans and strategies, actual and prospective customer lists, vendor lists, and pricing and sales data, among other things.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

138.    On September 27, 2019, McCormac resigned from her position at Ahern. Before resigning, McCormac emailed Ahern's confidential and trade secret information from her Ahern email address to her personal email address. On September 9, 2016, McCormac sent confidential equipment rental rates to her personal email address. On September 23, 2019, McCormac emailed a confidential customer list—containing information on 3,000 Ahern customers—to her personal email address. The customer list contained confidential information, such as the personal home addresses of decision-makers who worked for customers. One day before resigning, McCormac emailed confidential equipment rental rates to her personal email address again.  McCormac also emailed to a link to Ahern's sales representative compensation plan for 2019-2020 to herself, among other documents, before departing Ahern.

139.    Once McCormac resigned from Ahern, Defendant began employing McCormac in a substantially similar position to the position that McCormac held at Ahern.

140.    Upon information and belief, Defendant and McCormac used and continue to use Ahern's confidential equipment rental rates and customer list.

141.    Despite Ahern's demand that Defendant and McCormac cease and desist use of Ahern's confidential and trade secret information, Defendant and McCormac, upon information and belief, continue to use Ahern's confidential and trade secret information.

142.    Ahern filed a complaint against Defendant and McCormac in the Third Judicial District Court in Salt Lake County, Utah, on October 11, 2019 in relation to the foregoing allegations.  For purposes of this action, Defendant's actions with respect to McCormac provide an example of Defendant's conspiracy against Ahern alleged herein.

**Defendant's Conspiratorial Misconduct in South Carolina**

143.    Upon information and belief, Defendant solicited confidential, proprietary, and trade secret information from Ahern's former employee in South Carolina who, while still employed by Ahern, secretly worked with Defendant to open a competing location less than two miles from an existing Ahern location.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

144.    On April 24, 2018, Ahern hired William Meadows as a sales representative in Charleston, South Carolina.

145.    Upon starting employment at Ahern, Meadows agreed to the Employee Handbook, the Security Access Agreement, the Code of Conduct, the Confidentiality Agreement, the Blogging and Social Network Agreement, and the Email Misuse Agreement. Under these agreements, Meadows agreed to protect Ahern's confidential information from disclosure as described above.

146.    Ahern assigned Meadows an established account with existing Ahern customers that Ahern had built relationships with over time. To assist Meadows in his position, Meadows had access to Ahern's confidential information, including customer information, business methods, and strategic plans.

147.    On June 7, 2019, Meadows resigned from Ahern and immediately began working for Defendant as a territory manager. Ahern quickly learned that Meadows wiped all data from his company phone and email.

148.    In February 2019, Meadows, using his Ahern employee email in violation of Ahern policy, began communicating with Defendant.

149.    Four days before resigning, Meadows prevented a customer from receiving Ahern equipment, alleging that the equipment needed maintenance. Ahern inspected the equipment and found it to be in perfect working condition. While Ahern was inspecting the equipment, Defendant, at Meadows' direction, delivered the same equipment to the customer.

150.    Two weeks before Meadows resigned from Ahern, Meadows attended one of Defendant's events to promote a new location in Georgia, a mere two miles away from an existing Ahern location. Emails between Defendant and Meadows show that Defendant solicited Meadows to help Defendant open the competing location.

151.    Upon information and belief, Defendant and Meadows used and continue to use Ahern's confidential and trade secret information.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

152.    Despite Ahern's demand that Defendant and Meadows cease and desist use of Ahern's confidential and trade secret information, Defendant and Meadows, upon information and belief, continue to use Ahern's confidential and trade secret information.

153.    Ahern filed a complaint against Defendant and Meadows in the Court of Common Pleas, First Judicial Circuit of South Carolina, on August 30, 2019 in relation to the foregoing allegations.  For purposes of this action, Defendant's actions regarding Meadows provide another example of Defendant's racketeering conspiracy against Ahern alleged herein.

154.    Defendant solicited and hired other former Ahern employees in South Carolina, including employees from Ahern's Charleston and Greer, South Carolina locations.  While Ahern continues to investigate this and other potential misconduct in South Carolina, it believes and thereon alleges that Defendant used the same illicit tactics in South Carolina as in other parts of the country.

**Defendant Conspires to Gut Other Ahern Locations and Loot Ahern's Corporate Office**

155.    Defendant's pattern and practice of targeting Ahern employees through defamatory innuendo, increased compensation, theft of proprietary, confidential, and trade secret information by outgoing Ahern employees and exploitation of that information after the employees joined Defendant, formation or growth of Defendant's brick-and-mortar locations, often very near competing Ahern locations, and the resulting destruction of Ahern locations has repeated itself across the country.

156.    In places, Defendant's conspiracy gutted particular Ahern locations of large numbers of individuals based on the same types of lies, distortions, uncompetitive behavior, and bad acts described above.

157.    For example, to establish a Phoenix, Arizona location, Defendant hired a mechanic from Ahern's Phoenix location and a sales manager from Ahern's Odessa, Texas location.  Defendant promoted the former Ahern mechanic to branch manager for Defendant's new Phoenix location, and Defendant hired Ahern's former sales manager from Odessa, Texas as its sales manager for the Phoenix location.  The two of them then solicited at least 11 additional

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

Ahern employees for Defendant's Phoenix branch, including multiple sales representatives, drivers, and mechanics.  Defendant built its Phoenix location based largely with poached Ahern employees.

158.   Defendant hired at least nine Ahern employees, including one or more branch manager, service manager, mechanic, at least four sales representatives, and a driver to build its Lake Charles, Louisiana branch.

159.   In Oklahoma City, Oklahoma, Defendant's new branch was formed and developed based on Defendant's hiring of at least seven Ahern employees, including its branch manager, sales manager, service manager, multiple sales representatives, and several other employees.  In one or more instance, the Ahern employees hired to work for Defendant were told that Ahern's branch was going to close down and that Ahern was not making enough money.

160.   Ahern is, as noted above, headquartered in Las Vegas, Nevada.  Defendant attempted to hire, or actually hired, Nevada-based employees of Ahern in multiple instances.

161.   As noted above, Matt Allen repeatedly contacted an Ahern credit manager based in Las Vegas, Nevada, in an attempt to lure her to Defendant.  Defendant also solicited, targeted, and/or hired other Nevada-based employees of Ahern, both from Ahern's corporate office as well as branch-level employees, in Las Vegas, Nevada.

162.   On November 5, 2019 at approximately 8:30 P.M., two former Ahern employees, Keith Wade and Jessie Wade, called Ahern's Chief Development Officer, Cory Rosencranse. Rosencranse had not heard from the Wades for months, was not friends with the Wades, and never received a call from either of the Wades after work hours.

163.   Keith and Jessie Wade are husband and wife.  Jessie Wade had been Ahern's Vice President of Finance until she took a similar role for Defendant in or about June 2019.  While still with Ahern, both Keith Wade and Jessie Wade executed Employment Agreements that contain non-solicitation and non-disparagement provisions.  Pursuant to the non-solicitation provision, the Wades agreed not to solicit or attempt to hire Ahern employees, among other things. The obligations in the non-solicitation provision continue for two years following the end

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

of employment with Ahern.  Wade's non-solicitation agreement will remain in effect through mid- to late-2021.

164.    During the November 5, 2019 call, Keith Wade asked how Rosencranse was doing, asked if Rosencranse was happy at Ahern, and then stated that he was not calling to solicit Rosencranse.  Wade then asked if Rosencranse signed the "Work Agreement" that Ahern introduced to employees in the summer of 2019.  The "Work Agreement" contained a non-competition clause.  Rosencranse told Wade that he signed the "Work Agreement."

165.    The Wades told Rosencranse that they relocated to Missouri, were working for Defendant, and were very happy there.  They then asked Rosencranse about Don Ahern's health.  Then, the Wades asked if Rosencranse heard about an officer of Ahern who had been caught with a woman in a compromising sexual position at Ahern's offices.  Rosencranse believes that the Wades called him only to determine if they could get him to leave Ahern.

166.    Subsequently, on November 27, 2019 at approximately 12:40 P.M., Rosencranse returned a call from Keith Wade.  During this call, Wade told Rosencranse that Jabbok Schlacks would love to meet with Rosencranse.  Wade then indicated that he heard that Ahern recently opened a data center, and that Don Ahern was actively looking to sell the company possibly due to his health or for some type of end game.  Wade's actions, undertaken at the behest of Defendant, blatantly violated the non-solicitation clause in the Employment Agreement he executed with Ahern.

167.    Rosencranse then asked Wade if Jabbok Schlacks was aware that Rosencranse had signed the "Work Agreement" with Ahern that contained a noncompetition provision.  Wade responded that Schlacks knew that Rosencranse had signed the non-competition agreement they had plan to work around it.  Wade stated that Schlacks would move Rosencranse to Australia, where he would spend one year in a role setting up rental store locations in Australia and possibly New Zealand.  Wade stated that it could be an adventure, and that after one year, Rosencranse could stay in Australia if he chose to or come back to the United States to continue working.

168.    During the same call, Wade stated there is not a "bright future" at Ahern and again claimed that Don Ahern was actively intending to sell the company.  Wade claimed that Jabbok Schlacks had confirmed with an independent third party that Don Ahern actively intended to sell the company.  Wade stated that this was not a surprise because Don Ahern's health was poor and that he has no succession plan.  Wade then stated that he was not sure if Ahern could pull off a sale because of Don Ahern's questionable decisions.   Wade then referenced Defendant's plan to grow "rapidly and quickly." Wade said that he has some reservations about the rapid growth, but claimed that Jabbok and William Schlacks welcomed the conversation and advice, unlike the "old man" [i.e. Don Ahern], who Wade characterized as a "bully" and who Wade claimed ran Ahern like a "total dictatorship" and did not listen to anyone.

169.    On December 9, 2019, Rosencranse met with Jabbok Schlacks in Missouri as Defendant continued to solicit Rosencranse notwithstanding his non-competition agreement. Keith Wade set up this meeting and encouraged Rosencranse to attend it in violation of his non-solicitation agreement with Ahern.

170.    During the December 9, 2019 meeting, Rosencranse described the Work Agreement, including the non-competition provision, to Schlacks.  Schlacks opined that the non-competition provision was unenforceable and that Defendant would "go to the ends of the earth" to fight legal action taken to enforce it.  Schlacks stated that Defendant would spend $10 to $15 million on legal fees to defend Rosencranse.  Schlacks compared the non-competition clause to slavery, stated that non-competition agreements were not enforceable unless a person was the "actual CEO", and stated that he might file a federal anti-trust lawsuit against the industry for using such provisions.

171.    During the December 9, 2019 meeting, Schlacks stated that Defendant might purchase United but that Defendant would never be sold.  Schlacks also stated that Don Ahern has a prospectus out to sell Ahern.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

172.    In a separate instance, Defendant poached Ahern's consultant who was tasked with finding properties for Ahern pursuant to an exclusive consulting agreement.  Despite a contractual provision whereby the consultant agreed not to take on any business activities, paid or unpaid, for a third party during the term of the contract without authorization from Don Ahern, that consultant is now believed to be performing the exact same role for Defendant.  Ahern has sent letters to the consultant, and later to Defendant, concerning the consultant's breach of the agreement and Defendant's interference with the contract.  Despite this, the consultant is believed to continue to perform work for Defendant.  This matter is the subject of a separate civil action that Ahern had filed against the consultant and other entities, including Defendant, in the Eighth Judicial District Court of Nevada.

173.    In addition to the instances described above, Defendant solicited and hired Ahern employees in Washington, Florida, Georgia, Kansas, Maryland, New York, North Carolina, and Oregon.  In over two years, Defendant created dozens of brick-and-mortar locations exploiting Ahern's decades of experience and institutional knowledge, all through the conspiracy described above.

174.    The conspiratorial acts described in this complaint are believed to be the tip of the proverbial iceberg.  Ahern has begun a full-scale forensic examination of its electronic and computer systems to determine the full extent of the misappropriation of its trade secrets and other proprietary information by former employees.  It is anticipated that many more examples of theft, improper solicitation, and other bad acts will become known, at which time Ahern will seek leave to amend this complaint.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Federal Racketeer Influenced and Corrupt Organizations Act ("RICO Act"): Wire Fraud Predicate Act)

175.    Defendant knowingly conducted and/or participated, directly and indirectly, in the above described conduct through a "pattern of racketeering activity" as defined by 18 U.S.C. §

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

1961(5).

176.    Defendant engaged in a pattern of racketeering activity as alleged herein, including, but not limited to, racketeering constituting wire fraud under 18 U.S.C. § 1343.

177.    Defendant intentionally formed and participated in a scheme or artifice to defraud Plaintiff.

178.    Defendant engaged in multiple acts of wire fraud in violation of 18 U.S.C. § 1343, by transmitting and causing to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme.

179.    Specifically, Defendant's violated the wire fraud statute, as set forth in greater detail above, when Defendant directed Ahern employees to email confidential and proprietary information from Ahern systems, including but not limited to the AS400 system, to personal email accounts, for which there could be no purpose served other than to damage Ahern and benefit Defendant.  Many such instances of such wire fraud have involved six different employees at the direction of Defendant, as detailed above, and many more are believed to have occurred.

180.    The purpose of Defendant's scheme was to illicitly and illegally enrich Defendant, to build Defendant's market share in new markets, while defrauding and destroying Plaintiff.

181.    All of the predicate acts were and are related, establishing a pattern of racketeering activity under 18 U.S.C. § 1962(c), as their common purpose was to defraud and take money and property, through unlawful means, from Plaintiff.

182.    Defendant and the non-party participants in the illegal scheme, personally or through their agents, directly or indirectly, directed and/or participated in the acts alleged herein and employed the same or similar methods in their direction and/or participation of said acts.

183.    Defendant had specific intent to deceive and defraud Plaintiff.

184.    Plaintiff suffered damages in an amount to be determined at trial as a direct and proximate result of Defendant's racketeering.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

1

2

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

## SECOND CAUSE OF ACTION

### (RICO Act: Theft of Trade Secrets Predicate Act)

185.   Defendant knowingly conducted and/or participated, directly and indirectly, in the above described conduct through a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5).

186.   Without authorization, Defendant knowingly, willfully, maliciously, and without authorization, used third parties to download, copy, or duplicate and thereby steal and without authorization appropriate and take, Plaintiff's trade secrets. Specifically, as discussed in detail above, Defendant caused Ahern employees to download, copy, and duplicate Plaintiff's trade secrets (as defined by 18 U.S.C. § 1839(3)), as well as other proprietary and/or confidential information from computerized systems, which those employees then emailed to their personal accounts immediately before leaving Plaintiff to accept employment with Defendant.

187.   Defendant stole Plaintiff's trade secrets by coercing third parties to download Plaintiff's trade secrets and deliver said trade secrets to Defendant in violation of 18 U.S.C. § 1832(a)(2).

188.   Defendant received and possesses Plaintiff's trade secrets knowing those trade secrets have been stolen, appropriated, obtained, or converted without Plaintiff's authorization in violation of 18 U.S.C. § 1832(a)(3).

189.   Additionally, and in the alternative, Defendant further attempted to steal Plaintiff's trade secrets as detailed herein in violation of 18 U.S.C. § 1832(a)(4).

190.   Defendant knew that the information Defendant received from Plaintiff contained Plaintiff's trade secrets.

191.   Defendant knowingly stole Plaintiff's trade secrets to gain an economic benefit for Defendant.

192.   Defendant knew that by stealing Plaintiff's trade secrets, Defendant would cause injury to Plaintiff's business. Indeed, Defendant intended to damage or destroy Plaintiff's business.

193.    Plaintiff uses the trade secrets that Defendant stole from Plaintiff in interstate commerce because Plaintiff is a corporation with locations throughout the United States and the trade secret information that Defendant stole is used in several locations.

194.    Plaintiff seeks an award of damages in an amount to be determined at trial for Defendant's wrongful, willful, and malicious conduct as described herein.

## **THIRD CAUSE OF ACTION**

### **(Computer and Fraud Abuse Act)**

195.    Defendant's conduct as alleged herein violated 18 U.S.C. § 1030(a)(2). Specifically, and as described in detail above, Defendant, itself and/or through third parties acting at its direction: (1) intentionally accessed Plaintiff's computer, (2) without authorization or exceeding authorized access, and (3) thereby obtained information (4) from several protected computers involved in interstate communication, causing (5) a loss to Plaintiff during a one-year period aggregating at least $5,000 in value.

196.    Defendant's conduct as alleged herein violated 18 U.S.C. § 1030(a)(4). Specifically, and as described in detail above, Defendant, itself or through third parties acting at its direction: (1) accessed a protected computer, (2) without authorization or exceeding such authorization that was granted, (3) knowingly and with intent to defraud, and thereby (4) furthered the intended fraud and obtained something of value, causing (5) a loss to Plaintiff during a one-year period aggregating at least $5,000 in value.

197.    Defendant's conduct as alleged herein violated 18 U.S.C. § 1030(a)(5). Specifically, and as described in detail above, Defendant, itself or through third parties acting at its direction: (A) knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer; (B) intentionally accessed a protected computer without authorization, and as a result of such conduct, recklessly caused damage; and/or (C) intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

198.   Pursuant to 18 U.S.C. § 1030(g), Plaintiff seeks an award of damages in an amount to be determined at trial resulting from Defendant's violations of 18 U.S.C. § 1030(a), plus injunctive relief or any other equitable relief the Court deems appropriate.

**FOURTH CAUSE OF ACTION**

**(Federal Antitrust Violations/Attempted Monopolization—Sherman Act, Section 2)**

199.   Defendant's conduct, as described herein, violated section 2 of the Sherman Act, 15 U.S.C. § 2.  Defendant had specific intent to destroy competition, including Plaintiff and possibly other competitors, through anticompetitive conduct directed at accomplishing that purpose.

200.   Defendant, as part of its attempted monopolization of the rental equipment market, engaged in predatory or anticompetitive conduct with specific intent to monopolize and there is a dangerous probability of Defendant achieving monopoly power in interstate commerce, either nationally or at least in certain geographic markets where Defendant attacked Ahern's operations, and that conduct resulted in a causal antitrust injury to Ahern.

201.   If Defendant is successful in its scheme to destroy Ahern, to become the dominant force in the equipment rental market, and to monopolize that market, consumers and the construction industry in general would be harmed.

202.   As a direct and foreseeable result of the above-mentioned violations of the federal anti-trust laws, Defendant adversely affected Ahern's market share and market competitiveness, with a resulting impact on the market in general.  Ahern has, as a result of Defendant's anticompetitive behavior, lost revenues and market share, and those losses are attributable to Defendant.

203.   As described above, Defendant's unlawful conduct, and its resulting impact on the market occurred in or affected interstate and international commerce, constituting a per se violation of federal antitrust laws and acts as an unreasonable and unlawful restraint of trade.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

204.     Plaintiff suffered injuries that the antitrust laws were intended to prevent. Specifically, Plaintiff suffered damaged that flow from Defendant's anticompetitive behavior. Plaintiff seeks damages against Defendant in an amount to be determined at trial in this matter.

205.     Plaintiff suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### (Conversion)

206.      As described herein, Defendant engaged in one or more distinct acts of dominion wrongfully exerted over Plaintiff's personal property.  Specifically, Defendant caused outbound Ahern employees to steal electronic information from Ahern as described herein.

207.     Defendant's acts were in denial of, or inconsistent with Plaintiff's title or rights therein or in derogation, exclusion, or defiance of such title or rights.

208.     As a result of Defendant's conduct, Plaintiff suffered, and is entitled to recover, damages in an amount to be proven at trial

## SIXTH CAUSE OF ACTION

### (Business Defamation)

209.      As described herein, Defendant repeatedly made false and defamatory statements about Plaintiff's business.

210.     Defendant made an unprivileged publication of the defamatory statement to third persons, both including Plaintiff's own employees but also, upon information and belief, to Plaintiff's customers.

211.     Defendant is at fault for the publication of the defamatory statement.

212.     Defendant's defamation imputed Plaintiff's fitness for trade, business, and profession, and tended to injure Plaintiff in its business, and therefore is defamation per se and damages are presumed.

213.     As a result of Defendant's conduct, Plaintiff suffered, and is entitled to recover, compensatory damages in an amount to be proven at trial.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

214.   Defendant was guilty of oppression, fraud, and malice when it defamed Plaintiff. Accordingly, Plaintiff should be awarded punitive damages in an amount to be determined at trial.

215.   Plaintiff suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

## SEVENTH CAUSE OF ACTION

### (Fraud)

216.   Defendant made false representations.  Specifically, as part of its scheme to systematically loot Plaintiff of Plaintiff's employees and confidential/proprietary information, Defendant told Plaintiff's employees United would be purchasing Plaintiff, questioned Don Ahern's health, and alleged that an officer of Ahern had been caught in a sexually compromising position, among other things, all as detailed above.

217.   Defendant knew or believed that its representations were false or that it had an insufficient basis of information for making the representations.

218.   Defendant intended to induce Plaintiff's employees to act or refrain from acting upon the misrepresentation.  Specifically, Defendant intended to induce Plaintiff's employees to leave Ahern based on the misrepresentations, and Defendant sought to acquire Plaintiff's trade secrets and proprietary information with those employees.

219.   As a result of Defendant's fraud, which was done with malice, Plaintiff suffered, and is entitled to recover, compensatory and punitive damages in an amount to be proven at trial

## EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation)

220.   Defendant supplied false information in the course of Defendant's business. Specifically, as part of its scheme to systematically loot Plaintiff of Plaintiff's employees and confidential/proprietary information, Defendant told Plaintiff's employees that United would be purchasing Plaintiff, questioned Don Ahern's health, and told employees that an officer of Ahern had been caught in a sexually compromising position, among other things, all as detailed above.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

221.    Defendant supplied information that was false to guide unnamed third parties in their business transactions.  Specifically, Defendant intended to induce Plaintiff's employees to leave Ahern based on the misrepresentations, and Defendant sought to acquire Plaintiff's trade secrets, proprietary information, and customers, with those employees.

222.    Unnamed third parties, including but not limited to Ahern employees, justifiably relied upon Defendant's false representations.

223.    Defendant failed to exercise reasonable care or competence in obtaining and communicating the false information.

224.    Plaintiff suffered damage in an amount to be determined at trial as a result of Defendant's false representations.

## NINTH CAUSE OF ACTION

### (Intentional Interference With Contractual Relations)

225.    Plaintiff had valid and existing contracts with both its employees and with current customers.

226.    Defendant had knowledge of the contracts.

227.    As described herein, Defendant intentionally and maliciously engaged in acts intended or designed to disrupt Plaintiff's contractual relationships.

228.    Defendant's interference with Plaintiff's contracts involved the misappropriation of confidential information, unfair competition, and other tortious conduct as described herein.

229.    Defendant's conduct resulted in actual disruption of the contracts.

230.    As a result of Defendant's conduct, Plaintiff suffered, and is entitled to recover, compensatory and punitive damages in an amount to be proven at trial

231.    Plaintiff suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

## TENTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

232.     Plaintiff had valid and existing business relationships with various customers and prospective customers throughout the country.

233.     Defendant had knowledge of Plaintiff's prospective contractual relationships.

234.     Defendant maliciously and intentionally interfered with Plaintiff's prospective contractual relationships.   Defendant's interference with Plaintiff's prospective contracts involved misappropriation of confidential information, unfair competition, and other tortious conduct as alleged herein.

235.     Defendant's actions were not justified and not privileged.

236.     As a result of Defendant's conduct, Plaintiff suffered, and is entitled to recover, compensatory and punitive damages in an amount to be proven at trial

237.     Plaintiff suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

## ELEVENTH CAUSE OF ACTION

### (Deceptive Trade Practices Pursuant to NRS Chapter 598)

238.     Defendant engaged in a deceptive trade practice as defined under Nevada Revised Statutes Chapter 598.

239.     Defendant disparaged Plaintiff's business by making false or misleading representations of fact as described herein.  NRS 598.0915(8).

240.     Defendant knowingly misrepresented the legal rights, obligations or remedies of a party to a transaction as described herein.  NRS 598.092(8).

241.     As a result of Defendant's conduct, Plaintiff suffered damages in an amount to be determined at trial.

242.     Defendant knowingly and/or willfully engaged in the foregoing deceptive trade practices.  Defendant, or its officers and/or managing agents, should be ordered to pay Plaintiff all profits derived from Defendant's knowing and willful engagement in deceptive trade practices, and should be ordered to pay treble damages on all damages Plaintiff suffered by reason of its deceptive trade practices.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

**TWELFTH CAUSE OF ACTION**

**(Unfair Trade Practices/Antitrust/NRS Chapter 598A)**

243.    Defendant engaged in activity which constitutes combination or conspiracy in restraint of trade as described herein.

244.    Specifically, Defendant attempted to monopolize or otherwise combine or conspire to monopolize trade or commerce in Nevada in violation of NRS 598A.060(1)(e) as alleged herein.

245.    Plaintiff was damaged directly or indirectly in its business and property by reason of Defendant's violations and actions restraining trade.

246.    Plaintiff should be awarded damages in an amount to be determined at trial.

247.    Defendant should be enjoined from its ongoing bad acts pursuant to NRS 598A.210(1).

248.    Plaintiff should further be awarded statutory treble damages and its attorneys' fees as a result of Defendant's unfair trade practices pursuant to NRS 598A.210(2).

**THIRTEENTH CAUSE OF ACTION**

**(Nevada Computers Act: Unfair Trade Practices NRS 603.040)**

249.    Defendant's conduct as described herein violated Nevada's Computers statute, NRS 603.040 et seq.

250.    Specifically, Defendant engaged in unfair trade practices by obtaining possession and/or access to Plaintiff's proprietary program and/or data stored in computers with intent to deprive or withhold from Plaintiff its control over that program or data and to convert that program or data to Defendant's own use or the use of another in violation of NRS 603.040(1).

251.    Defendant, by bribe, reward and/or the offer of value to another person, obtained or attempted to obtain from that other person an unauthorized copy of a proprietary program or the data stored in computers as described herein in violation of NRS 603.040(3).

252.    Plaintiff suffered damages in an amount to be proven at trial as a result of Defendant's unfair trade practices.  In addition to damages suffered by Plaintiff as a result of

Defendant's acts, the Court should order Defendant to pay Plaintiff all profits Defendant derived from its wrongful acts pursuant to NRC 603.080(2)(b).

253.    Plaintiff is entitled to injunctive relief to enjoin Defendant's unfair trade practices respecting the stolen program/data and to restrain Defendant's infringement of Plaintiff's trade secrets as the Court deems just and reasonable.

## FOURTEENTH CAUSE OF ACTION

### (Nevada Computers Act: Infringement of Trade Secrets NRS 603.050)

254.    Defendant infringed on Plaintiff's trade secrets in violation of NRS 603.050.

255.    Specifically, Defendant, without Plaintiff's consent, obtained possession of and/or access to a proprietary program or a compilation of proprietary information that was stored as data in a computer and made, or caused to be made, a copy of that program or data.

256.    Such program/data was used in Plaintiff's business, gave Plaintiff an opportunity to obtain an advantage over competitors who do not know or use it, were treated by Plaintiff as secrets, and are not copyrighted because an application therefor would result in the program or data no longer being secret.

257.    Plaintiff suffered damages in an amount to be proven at trial as a result of Defendant's unfair trade practices.  In addition to damages suffered by Plaintiff as a result of Defendant's acts, the Court should order Defendant to pay Plaintiff all profits Defendant derived from its wrongful acts pursuant to NRS 603.080(2)(b).

258.    Plaintiff is entitled to injunctive relief to enjoin Defendant's unfair trade practices respecting the stolen program/data and to restrain Defendant's infringement of Plaintiff's trade secrets as the Court deems just and reasonable.

## FIFTEENTH CAUSE OF ACTION

### (Civil Conspiracy)

259.    Defendant and various individuals, including Ahern employees, engaged in an actionable conspiracy via either an explicit or a tacit agreement.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

260.     Specifically, Defendant undertook concerted action with the intent to accomplish an unlawful objective for purposes of harming Plaintiff as described herein.

261.     Plaintiff suffered damages in an amount to be proven at trial as a result of Defendant's conspiracy.

## SIXTEENTH CAUSE OF ACTION

### (Aiding and Abetting)

262.     Defendant knowingly and substantially assisted and/or encouraged various individuals, including Ahern employees, to breach those individuals' duties to Ahern as described herein.

263.     Defendant was aware of its role in promoting those individuals to breach their duties to Ahern.

264.     Plaintiff suffered damages in an amount to be proven at trial as a result of Defendant's aiding and abetting.

## SEVENTEENTH CAUSE OF ACTION

### (Nevada Statutory Racketeering)

265.     Defendant engaged in unlawful acts listed in NRS 207.400(c) and NRS 207.400(i) as alleged below.

266.     Defendant engaged in a racketeering enterprise.

267.     Defendant engaged in two non-isolated racketeering activities.

268.     Specifically, Defendant's racketeering activities, as described above in detail, include the taking of Plaintiff's property under circumstances not amounting to robbery pursuant to NRS 207.360(9) (i.e., conversion), its widespread and repeated fraud pursuant to NRS 207.260(35) (via NRS 205.377), receiving, possessing, and/or withholding stolen goods valued at $650 or more pursuant to NRS 207.360(26), and obtaining possession of money or property valued at $650 or more pursuant to NRS 207.360(28).

269.     As alleged herein, Defendant in the course of its enterprise, knowingly and with the intent to defraud, engaged in an act, practice or course of business or employed a device,

scheme or artifice which operated or would operate as a fraud or deceit upon a person by means of a false representation or omission of a material fact that, which Defendant knew to be false or omitted, and which Defendant intended Plaintiff (including Plaintiff's employees) to rely on. The fraud resulted in loss to Plaintiff. There were at least two transactions that have the same or similar pattern, intents, results, accomplices, victims and methods of commission.

270.    Defendant's racketeering activities had the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

271.    Plaintiff's injuries flow from Defendant's violation of predicate Nevada racketeering activities.

272.    Plaintiff did not participate in the predicate acts.

273.    Defendant's violations proximately caused Plaintiff's injuries. Plaintiff should be awarded damages pursuant to NRS 207.470 relating to Defendant's racketeering. Specifically, Plaintiff should be awarded three times the actual damages Plaintiff sustained pursuant to NRS 207.470(1), attorneys' fees and costs and all other costs and expenses of the proceedings, and the recovery of any property that the Court may order forfeited by Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief against Defendant as follows:

1.    An award of compensatory, exemplary, and punitive damages against Defendant in an amount to be proven at trial;

2.    Statutory double and treble damages as applicable;

3.    Preliminary and permanent injunctive relief;

4.    An award of attorneys' fees and costs incurred in the instant litigation;

/ /

/ /

/ /

/ /

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135

5.      An award of prejudgment and post-judgment interest against Defendant; and

6.      For such other and further relief as the Court deems just and equitable.

DATED this 13th day of December, 2019.

FOX ROTHSCHILD LLP


*/s/ Mark J. Connot*
MARK J. CONNOT (10010)
KEVIN M. SUTEHALL (9437)
LUCY C. CROW (15203)
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
*Attorneys for Plaintiff Ahern Rentals, Inc.*

Active\106008684.v2-12/13/19